# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| L&M ETHANOL MAINTENANCE CONTRACTING, INC., | No. C19-3042-LTS |
| Plaintiff, | |
| vs. | **MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| MARK GAALSWYK, ET AL., | |
| Defendants. | |

## I. INTRODUCTION

This case is before me on a motion (Doc. 18) for summary judgment filed by defendants Mark Gaalswyk, Robert Parra, William Hinz and Easy Automation, Inc. (EAI). Plaintiff L&M Ethanol Maintenance Contracting, Inc. (L&M), has filed a resistance (Docs. 22, 25–27) and defendants have filed a reply (Doc. 30). Oral argument is not necessary. *See* Local Rule 7(c).

## II. PROCEDURAL HISTORY

L&M filed this case in the Iowa District Court for Webster County on August 8, 2019. Doc. 1. L&M seeks to recover a judgment debt owed by Easy Energy Systems, Inc. (EES), by piercing EES' corporate veil to hold defendants liable. Doc. 3. On August 27, 2019, defendants filed a notice of removal to this court on the basis of diversity jurisdiction. Doc. 1.

## III. SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with

affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 248–49. The party moving for entry of summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential

element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

## IV.  RELEVANT FACTS

Before summarizing the facts relevant to this case, I must address the parties' summary judgment filings. Defendants argue that L&M's resistance materials fail to comply with this court's local rules because L&M failed to "expressly admit[], den[y], or qualify[]" defendants' numbered statement of facts, and to provide record citations for many of its own factual assertions, as required under Local Rule 56(b). Defendants ask that each factual assertion set forth in their own statement of undisputed facts (Doc. 18-2) be deemed admitted, and that L&M's statement of disputed materials facts (Doc. 27) be stricken. Doc. 30 at 5–7.

Defendants are correct about L&M's blatant noncompliance. Local Rule 56(b) states:

> b.  **Resisting Party's Documents**. A party resisting a motion for summary judgment must, within 21 days after service of the motion, file contemporaneously all of the following:

1.    A brief that conforms with the requirements of Local Rule 7(e) in which the resisting party responds to each of the grounds asserted in the motion for summary judgment;

2.    A response to the statement of material facts in which the resisting party expressly admits, denies, or qualifies each of the moving party's numbered statements of fact, filed as an electronic attachment to the brief under the same docket entry;

3.    A statement of additional material facts that the resisting party contends precludes summary judgment, filed as an electronic attachment to the brief under the same docket entry; and

4.    An appendix that conforms with the requirements of section (e) of this rule, filed as an electronic attachment to the brief under the same docket entry.

A response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record.

The failure to respond to an individual statement of material fact, with appropriate appendix citations, may constitute an admission of that fact. Each individual statement of additional material fact must be concise, numbered separately, and supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the statement, with citations to the appendix containing that part of the record.

N.D. Ia. L.R. 56(b) [emphasis added].  L&M did not come close to complying with these requirements.  Indeed, L&M appears to have gone out of its way to refuse to comply.  For example:

1.    L&M did not file a response to defendants' statement of undisputed facts.

4

2.      L&M did not file an appendix that conforms with Rule 56(e).[1]

3.      While L&M did file a statement of additional material facts (Doc. 27), the vast majority of the alleged facts contained in that document are not supported by any citation to the record.

These failures are neither inconsequential nor excusable. The requirements of specific responses to statements of fact and of citations to the record in support of factual assertions are critical to assisting the court in evaluating motions for summary judgment and determining what material facts are genuinely disputed. *See, e.g.*, *Nw. Bank & Tr. Co. v. First Illinois Nat'l. Bank*, 354 F.3d 721, 725 (8th Cir. 2003) ("[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions." (alteration in original) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994))).

What's worse, and entirely inexplicable, is that L&M was put on notice of its failures to comply and given a chance to correct those failures, yet still failed to do so. L&M filed an initial "combined response" (Doc. 22) to defendants' motion for summary judgment that was not compliant with this court's rules. The parties then filed a joint motion (Doc. 23) to continue briefing deadlines that included the following information:

5.      [On] April 20, 2020, Defendants' counsel, via email, alerted Plaintiff's counsel that the Combined Response fails [to] comport with applicable rules, and also of Plaintiff's failure to respond to Defendants' statement of materials facts. Defendants' counsel suggested that Plaintiff refile its materials on or before April 27, 2020.

6.      On April 21, 2020, Plaintiff's counsel responded and agreed that Plaintiff would refile its response materials on or before April 27, 2020.

---

[1] Rule 56(e) describes an appendix that is akin to what a party would prepare and submit to an appellate court and provides that "[a]ll references to supporting documents in a brief, a statement of material fact, or a resistance or reply to a statement of material fact must be to a specific page number in an appendix."

Doc. 23 at 2.  That motion was granted.  Doc. 24.

Even after being given this second chance, and being expressly cautioned about its "failure to respond to Defendants' statement of materials facts," L&M's second attempt at resisting the motion suffers from the obvious flaws itemized above.  *See* Docs. 25, 26, 27.  Given this history, and in accordance with Local Rule 56(b), I hereby deem all of the facts set forth in defendants' statement of undisputed facts (Doc. 18-2) to be true, as L&M failed to respond to those facts.  I further strike all of the factual assertions set forth in L&M's statement of disputed materials facts (Doc. 27) except those that are expressly supported by a citation to record evidence.[2]

Finally, I note that defendants' own reply to L&M's opposition materials goes beyond what the court's rules permit.  Defendants provided a response (Doc. 30-1) to L&M's statement of disputed material facts, which is entirely appropriate.  *See* N.D. Ia. L.R. 56(d).  However, in the same document defendants then submitted 64 paragraphs of "additional facts in support of summary judgment."  Doc. 30-1 at 24–31.  Local Rule 56 does not provide a mechanism under which a party seeking summary judgment may, as part of its reply, submit additional facts in support of the motion.  Given that the reply is the "last word," the resisting party has no vehicle through which to admit or deny those additional, alleged facts.  If defendants' additional facts are critical to their ability to meet their burden of identifying those portions of the record that show a lack of a genuine issue of material fact, then they should have been included in defendants' initial filing.  The additional facts set forth on pages 24 through 31 of defendants' response (Doc. 30-1) to L&M's statement of disputed material facts are hereby stricken.

---

[2] While L&M's failure to file an appendix is concerning, I consider its citations to the exhibits filed with its opposition materials to be in substantial compliance with the appendix requirement. Unfortunately for L&M, it did not bother to cite to any of its exhibits with regard to the vast majority of the alleged facts set forth in its statement of disputed material facts (Doc. 27).

Based on these rulings, the following facts are undisputed for purposes of defendants' motion for summary judgment:

In 2006, Gaalswyk founded EES as a subchapter S corporation in Minnesota. Doc. 18-2 at 2–3. Gaalswyk was not new to entrepreneurship, as he has owned and served as the CEO of another business in Minnesota, EAI, for over 30 years. *Id.* at 1. EAI designs and sells automated feed systems to farming operations. *Id.* Gaalswyk's goal in forming EES was to create modular biofuel-processing equipment that could be easily crated, shipped and assembled at multiple remote locations. *Id.*

During its first several years of existence, EES had limited operations and few employees. *Id.* Starting in 2011, however, Gaalswyk began transitioning EES into an operational business.[3] *Id.* at 3. To help with this transition he appointed two successful entrepreneurs, Hinz and Parra, to EES' board of directors. *Id.* Gaalswyk has been EES' CEO since its incorporation except for a two-year span, 2011 to 2013, during which Hinz acted as CEO. *Id.*

EES was initially funded by an investment of $1,000 by Gaalswyk at the time of incorporation. *Id.* at 2. During the first few years, EES increased its capital by applying for and receiving grants and by receiving loans from Gaalswyk. *Id.* at 2–4. The loans to EES were secured by its assets. *Id.* By 2011, Gaalswyk had loaned approximately $700,000 to EES. *Id.* at 4. In 2012, Gaalswyk began seeking capital from other sources. *Id.* at 4. He received more than $800,000 from out-of-state investors, who were given a 4% ownership stake in the company. *Id.* Gaalswyk's pre-2011 loans to EES were converted into common stock at the time of the outside investment, and he has retained the remaining 96% stake in the company since then. *Id.* Gaalswyk continued to make

_____

[3] EES' board of directors amended its articles of incorporation as part of this process. Doc. 30-1 at 25.

secured loans to EES, which amount to over $10 million, and to obtain secured loans from other sources, such as EAI and banks. *Id.*

In 2016, EES began constructing a pilot facility in Emmetsburg, Iowa, on land owned by EAI and Montag Investments, LLC. *Id.* at 5. EES paid rent to EAI for use of the land. *Id.*; Doc. 30-1 at 30. EAI was also paid as a vendor for providing panels and programming services for the facility's equipment. *Id.* The Emmetsburg facility was expected to be a substantial source of revenue for EES and was key to its future success. *Id.*

To help fund the pilot project, EES reached a customer-partner agreement with Flint Hills, a subsidiary of Koch Industries, which would use the facility upon completion. *Id.*; Doc. 30-1 at 27. However, by November 2016, the Emmetsburg project hit financial trouble. Doc. 18-2 at 5–7. Cost overruns by the construction contractor rendered it difficult for EES to keep making payments as they became due. *Id.* at 6–7. Gaalswyk believed the project could be profitable if completed, however, so he continued to seek new sources of financing. *Id.* at 5–7.

From February to June of 2017, EES retained L&M to perform welding and fabrication work on the Emmetsburg facility. Doc. 18-2 at 5. L&M billed EES $137,283.77 for its services but EES failed to pay. *Id.*; Doc. 22 at 1. On July 13, 2017, L&M filed a mechanics lien in the Iowa District Court for Palo Alto County. Doc. 22 at 1. On August 14, 2017, L&M attempted to foreclose its mechanics lien by filing a complaint in the Iowa District Court for Palo Alto County. *Id.* After the case was removed to federal court by EES and EAI, the parties settled the case on November 29, 2017. *Id.* at 1–2. In the settlement agreement, EES agreed to pay $138,283.77 to L&M in monthly installments of $5,000. *Id.* EES paid L&M $37,520 pursuant to the settlement agreement but stopped making payments in August 2018. *Id.* at 2; Doc. 30-1 at 2. At that time, EES still owed L&M $96,283.77 plus interest, costs and attorney fees. Doc. 22 at 2; Doc. 30-1 at 2.

Two months after EES ceased making payments, L&M filed a confession of judgment against EES in the Iowa District Court for Webster County. Doc. 22 at 2. L&M then obtained an order for a debtor's exam and served a deposition subpoena. *Id.* In place of the debtor's exam and deposition, however, EES produced a number of records to L&M. *Id.*; Doc. 30-1 at 2. After receiving and analyzing the records EES produced, L&M filed the current action to pierce EES' corporate veil and hold the named defendants liable for EES' obligation to L&M. Doc. 22 at 2.

Other relevant facts will be discussed as necessary.

## V.    ANALYSIS

Defendants argue that they are entitled to summary judgment because L&M, as a matter of law, is not entitled to pierce EES' corporate veil and hold them liable. Doc. 18-1 at 8–19. The question of whether to pierce corporation's veil is a fact-intensive analysis that is established by state law. *See Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 649 (8th Cir. 2003).

The parties seem to disagree as to which state's law governs this case. Defendants argue that Minnesota law controls because (1) shareholder liability is determined by the law of the state of incorporation pursuant to the internal affairs doctrine and (2) EES is a Minnesota corporation. Doc. 18-1 at 6. L&M does not directly address which state's law controls but cites to Iowa case law in its arguments. Doc. 22 at 3–4.

To determine which state's law applies to the legal issues in a diversity action, a federal court must apply the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). However, before applying choice of law rules, the court must determine that a conflict between the states' respective laws actually exists. *Consul Gen. of Republic of Indonesia v. Bill's Rentals, Inc.*, 330 F.3d 1041, 1045 (8th Cir. 2003).

The standards for determining shareholder liability for corporate debts are substantially similar in Iowa and Minnesota. Both states have statutes that limit shareholders' personal liability for a corporation's acts and debts to the extent of their investment in the corporation. Iowa Code § 490.622; Minn. Stat. § 302A.425. Both states also have common law exceptions that allow a creditor to "pierce the corporate veil" in order to hold shareholders personally liable in some circumstances. *See Victoria Elevator Co. of Minneapolis v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn. 1979); *Briggs Transp. Co. v. Starr Sales Co.*, 262 N.W.2d 805, 810 (Iowa 1978).

Minnesota courts apply a two-part test that sets aside shareholders' limited liability when (1) the corporate entity is used as an alter ego and (2) piercing the corporation's veil is necessary to prevent injustice or fundamental unfairness. *Victoria Elevator*, 283 N.W.2d at 512. Factors courts have found significant when applying the alter ego test include "insufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of corporation as merely façade for individual dealings." *Id.*

Iowa courts have not adopted a specific test for determining when to set aside limited liability, but they consider virtually the same factors Minnesota courts have found significant. *See Briggs Transp. Co.*, 262 N.W.2d at 810. Iowa courts also consider, as an overarching principle, whether piercing a corporation's veil is necessary to prevent corporations from being used "as an intermediary to perpetuate fraud or promote injustice." *Id.* Thus, in many ways, there is no real conflict between Minnesota and Iowa law on this matter. *Cf. Farmers Coop. Soc'y, Sioux Ctr., Iowa v. Leading Edge Pork, LLC*, No. 16-CV-4034-LRR, 2016 WL 6902406, at *3 (N.D. Iowa Nov. 23, 2016) (finding no conflict of law when "the laws of both Iowa and Minnesota are in harmony with regard to the personal liability of a member of a limited liability company").

10

To the extent that Minnesota and Iowa law are in conflict, however, Minnesota law controls. This court has previously found that although Iowa courts have not determined which state's law applies when an Iowa plaintiff attempts to pierce the veil of an out-of-state corporation, Iowa courts would most likely apply the law of the state of incorporation. *Tyson Fresh Meats, Inc. v. Lauer Ltd., L.L.C.*, 918 F. Supp. 2d 835, 850 (N.D. Iowa 2013). This court concluded that doing so best aligns with the internal affairs doctrine recognized in most states by respecting the power of states to decide when to strip limited liability away from corporations organized under their laws and giving corporations greater consistency and predictability while operating in multiple states. *Id.* I agree with and adopt the analysis set forth in *Tyson Fresh Meats*. Thus, because it is undisputed that EES is a Minnesota corporation, I will evaluate L&M's veil-piercing claim under Minnesota law.

As stated above, under Minnesota law a court may pierce the corporate veil when the corporate entity is used as an alter ego. *Hoyt Properties, Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 318 (Minn. 2007). When analyzing whether an individual is using a corporation as an alter ego, "courts look to the 'reality and not form, with how the corporation operated and the individual defendant's relationship to that operation.'" *Id.* (quoting *Victoria Elevator*, 283 N.W.2d at 512). Relevant factors include whether the corporation:

 (1) is sufficiently capitalized for its undertaking,

 (2) observes corporate formalities,

 (3) pays dividends,

 (4) was insolvent at the time the transaction in question occurred,

 (5) has funds siphoned away by dominant shareholders,

 (6) has functioning officers and directors,

 (7) has adequate corporate records, and

 (8) is merely a façade for individual dealings.

11

*Id.* at 318–19. If the court concludes that the corporation is being used as an alter ego, it must then consider whether "piercing the corporate veil is necessary to avoid injustice or fundamental unfairness." *Barton v. Moore*, 558 N.W.2d 746, 749 (Minn. 1997). The injustice or unfairness to be avoided must be something distinct from the mere limitation of liability, as "[d]oing business in a corporate form in order to limit individual liability is not wrong; it is, in fact, one purpose for incorporating." *Victoria Elevator Co.*, 283 N.W.2d at 512.

Because each of the named defendants had different relationships and interactions with EES, and evaluating an individual defendant's relationship to the corporation is essential to a veil-piercing analysis, I will analyze L&M's claims against each defendant based on that defendant's relationship to EES.

### A.      *Piercing the Veil to Reach Shareholders – Gaalswyk*

As the incorporator and majority shareholder of EES, Gaalswyk is naturally the first individual to evaluate for veil-piercing purposes. *G.G.C. Co. v. First Nat. Bank of St. Paul*, 287 N.W.2d 378, 384 (Minn. 1979) ("[W]here the corporate veil is pierced, it is usually to hold the shareholders liable."). L&M argues that Gaalswyk should be held liable for four reasons.[4] First, EES was undercapitalized for its operations. Doc. 22 at 4–5. Second, Gaalswyk failed to follow corporate formalities in conducting EES' business, particularly in regard to corporate records. *Id.* at 8–10. Third, Gaalswyk improperly siphoned funds from EES in the form of preferential payments on loans he and his other corporation, EAI, made to EES. *Id.* at 5–6. Fourth, Gaalswyk acted

---

[4] In their motion for summary judgment, defendants address all eight of the factors, listed above, that are typically considered in a veil-piercing analysis. Doc. 18-1 at 8–13. In its response, L&M addresses only some of those factors. Any factor that L&M chose not to address is deemed to weigh against piercing EES' corporate veil.

fraudulently by inducing L&M to perform work on EES' project despite EES' being insolvent. *Id.* at 7, 12.

In support of its argument that EES was "vastly undercapitalized," L&M relies solely on EES' federal income tax returns from 2015 to 2017. *Id.* at 4. EES had retained earnings of -$7,330,102, -$7,552,373, and -$8,405,677 from 2015 to 2017. *Id.* EES' net income during that period was also negative: -$758,552, -$218,907 and -$852,165, respectively. *Id.* L&M argues that EES' sustained losses over that three-year period show that it was insufficiently capitalized for a number of years, including 2017, the year in which L&M performed work for EES. *Id.* at 5.

This evidence is insufficient to prove that EES was undercapitalized. Generally, the capitalization analysis examines a corporation's capital when it is founded, not when it begins to fail. *See Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1079 (D. Minn. 2013) ("The adequacy of capitalization must be measured at the time of incorporation because it reveals whether the corporation was created to avoid liability."). However, even if a corporation's initial capital investment is low, it is not necessarily undercapitalized. Minnesota courts have held that a corporation is not undercapitalized as long as its total equity generally keeps pace with its expenses and liabilities. *See Snyder Elec. Co. v. Fleming*, 305 N.W.2d 863, 868 (Minn. 1981); *see also Waterman v. Harold*, No. C5-89-1978, 1990 WL 92869, at *2 (Minn. Ct. App. July 10, 1990) ("[T]he obligation to provide adequate capital begins with incorporation and continues during the corporation's operations."); *Almac, Inc. v. JRH Dev., Inc.*, 391 N.W.2d 919, 923 (Minn. Ct. App. 1986) (superseded by statute on other grounds) (finding that corporation with initial capital investment of $1,000 was not undercapitalized because shareholders continued to contribute capital to the corporation until losses became too great).

At the time of formation, Gaalswyk invested $1,000 into EES for 100% ownership, which is a relatively small amount for an ambitious business venture. However, as its operations grew, EES continued to obtain capital in the form of equity

Case 3:19-cv-03042-LTS-MAR   Document 33   Filed 01/04/21   Page 13 of 21

funding (selling stock to outside investors), debt funding (loans from Gaalswyk, EAI and banks), business development grants, and customer-partnership agreements (with Flint Hills). This type of capital structure is not uncommon for close corporations. 1 Fletcher Cyc. Corp. § 41.33 (updated Sept. 2020) ("Often, a small or close corporation may be capitalized with only a small portion of the investments or contributions represented by shares and with the larger portion of capital structured as loans to the corporation."). L&M has failed to show that Gaalswyk's loans, and the other sources of funding he secured for EES, provided insufficient capital for EES to meet its liabilities. Indeed, the evidence shows that EES had sufficient capital to function and grow for several years. *Snyder*, 305 N.W.2d at 868 (noting that total equity consists of "stated capital plus shareholder loans plus retained earnings"); *see also U.S. Consulting, LLC v. Roggatz*, No. A12-0325, 2012 WL 6554435, at *5 (Minn. Ct. App. Dec. 17, 2012) (unpublished) (finding that under *Snyder* "shareholder loans count towards equity, not corporate liability"). The fact that EES may have become undercapitalized during the period from 2015 to 2017 – years in which it began to experience financial trouble – does not prove that EES was consistently undercapitalized in previous years. *See Almac*, 391 N.W.2d at 923 ("Under *Snyder*, the mere fact the corporation became insolvent does not mean the corporation was undercapitalized."). This factor does not weigh in favor of piercing the corporate veil.

L&M's second argument is that defendants failed to follow a number of corporate formalities from 2015 to 2018, such as holding board of directors' meetings, reviewing EES' finances, or reviewing payments to creditors, including Gaalswyk. Doc. 22 at 8. L&M has provided almost no support for this assertion.[5] It is undisputed that Gaalswyk

---

[5] L&M's argument regarding corporate formalities is based primarily on complaints that defendants failed to produce certain corporate records in discovery, such as financial records, shareholder lists and board of directors' meeting notes for 2015 to 2018. *Id*. Arguments

properly incorporated EES under Minnesota law and that EES had its own bank account. *See* Doc 18-2 at 2; Doc. 22-5; Doc. 31 at 27. Defendants have provided directors' meeting minutes from several years and financial statements from one year. Doc. 31 at 36–70. While it is unclear why records from other years are not in the summary judgment record, L&M has produced no evidence that they were not made and kept.

L&M has produced evidence that may show a failure to follow corporate formalities regarding Gaalswyk's loans to EES. EES' bank account records show that EES made over $1.3 million in payments to Gaalswyk from August 2017 to July 2018. Doc. 22 at 5–6. While some are designated as salary, the majority have no designated explanation, are inconsistent in amount and are signed by Gaalswyk himself. *See* Doc. 22-5. L&M also argues that although Gaalswyk claims to have loaned over $10 million to EES, the only record of any such loans is a $2 million promissory note from 2012, which matured in December 2016 and has not been paid. Doc. 22 at 6–7.

Gaalswyk states, by affidavit, that his loans to EES "are secured by filed UCC financing statements, which were filed before 2016." Doc. 18-3 at 5-6, ¶ 10. L&M has produced no evidence to the contrary. While defendants' financial documents from 2017 show that it owed millions to Gaalswyk and paid $305,788.09 in interest expenses to Gaalswyk that year, *see* Doc. 32 at 74, 77, they do not otherwise account for the $603,251 of unclassified payments EES' bank records show it made to Gaalswyk in just the last few months of 2017.

---

regarding the adequacy of discovery are inappropriate at this stage, however, as the deadline for pursuing discovery is closed. *See Enerplus Res. (USA) Corp. v. Wilkinson*, 801 F. App'x 448, 451 (8th Cir. 2020) (holding that a defendant could not oppose a motion for summary judgment on the basis of inadequate discovery when the defendant failed to pursue discovery before the close of discovery). Under the scheduling order in this case, discovery closed on July 10, 2020. Doc. 11. Any motions concerning discovery must be filed no later than 14 days after the close of discovery. N.D. Ia. L.R. 37(c). At no time did L&M file a motion concerning the alleged inadequacy of defendants' discovery responses.

This lack of explanation or evidence provides some support for L&M's claim that EES failed to follow corporate formalities regarding Gaalswyk's loans to EES. *See Cornerstone Home Builders, Inc. v. Guyers Dev.*, LLC, No. A09-1178, 2010 WL 1541344, at *8 (Minn. Ct. App. Apr. 20, 2010) (finding the absence of records regarding loan between an owner and the corporation weighed in favor of piercing the veil). Thus, this factor weighs in L&M's favor to some degree. However, because EES followed other corporate formalities, and L&M has provided evidence regarding loan transactions over only a one-year span, this factor is not particularly strong.

L&M's third argument is that the $1.3 million paid to Gaalswyk between August 2017 and July 2018 is evidence that he inappropriately siphoned funds from EES. Doc. 22 at 5–6. As noted above, L&M admits that some of these payments represented Gaalswyk's salary, but notes that the purpose of the other payments is not identified in EES' bank records. *Id.* It also notes that Gaalswyk made several deposits into EES' bank account, the purpose of which is unclear. *Id.* Because EES was in financial trouble at the time, L&M argues that the payments to Gaalswyk were improperly-siphoned funds that should have gone to other creditors, such as L&M. *Id.*

Gaalswyk does not deny that he received payments from EES and does not address the deposits he made into EES' bank account. However, he argues that the payments he received were legitimate payments on his secured loans to EES, not siphoning. Doc. 30 at 12. He argues that his rights as a secured creditor of EES were superior to the claims of L&M and other unsecured creditors. *Id.* According to Gaalswyk, EES had no obligation to pay unsecured creditors, such as L&M, yet nonetheless attempted to pay some of its unsecured debts to the detriment of Gaalswyk's secured debts. *Id.* at 12–14.

Although it is undisputed that Gaalswyk was a secured creditor of EES, and thus has priority over unsecured creditors like L&M, this does not entirely resolve the issue. As noted above, the manner in which EES' repayment of Gaalswyk's loans was documented from August 2017 to July 2018 was very informal. The fact that there was

no consistency in, or explanation for, the amounts paid to Gaalswyk at that time, as well as the fact he signed most of the checks himself, weighs in L&M's favor. 1 Fletcher Cyc. Corp. § 41.40 ("[T]he repayment of loans from shareholders at a time when the company's finances are troubled may strongly indicate siphoning"); *see also Victoria Elevator*, 283 N.W.2d at 512–13 (finding that shareholder's alleged but undocumented loans and withdrawal of funds allegedly as wages "at a time when the corporation was in financial trouble" weighed in favor of piercing the corporate veil). So too does the fact that Gaalswyk received these payments shortly after L&M attempted to foreclose on its mechanics lien. While there is not necessarily anything wrong with choosing to pay a secured creditor over an unsecured creditor, the fact that the secured creditor is the majority shareholder is significant. *See* 1 Fletcher Cyc. Corp. § 41.40 ("[S]ecured loan transactions between officers or directors and the corporation are fundamentally suspect, and they [should] receive close scrutiny by the courts."); *cf. Ass'n of Mill & Elevator Mut. Ins. Co. v. Barzen Int'l, Inc.*, 553 N.W.2d 446, 450 (Minn. Ct. App. 1996) (refusing to pierce the corporate veil to hold a parent company liable for using funds from liquidating a subsidiary to pay down *a bank's* secured loan instead of unsecured debt owed to the plaintiffs). This factor weighs in L&M's favor.

Finally, L&M argues that piercing the corporate veil is justified because Gaalswyk acted fraudulently by inducing L&M to perform work for EES even though EES was insolvent. However, L&M has failed to show that EES was insolvent at the time it retained L&M. At most, L&M has shown that EES was in some financial trouble, and had two mechanics liens filed against it, when L&M agreed to perform services in February 2017. *See* Doc. 22-8 at 2–3, 15. But these factors alone do not prove that EES was insolvent or that Gaalswyk acted fraudulently by retaining L&M. Indeed, rather than evidencing fraud, EES' effort to finish its pilot project by retaining L&M and other contractors appears to have been the only method of salvaging the project and satisfying the existing mechanics liens. Moreover, while claiming that it was the victim of

17

fraudulent inducement, L&M has not shown that it had no way to protect itself by exercising basic diligence before performing the work, such as inquiring about EES' financial condition. This factor does not weigh in favor of piercing the veil.

Thus, of the eight factors considered by Minnesota courts under the "alter ego" analysis, only two are present here. Moreover, "[d]isregard of the corporate entity requires not only that a number of these factors be present, but also that there be an element of injustice or fundamental unfairness." *Victoria Elevator*, 283 N.W.2d at 512 (citing *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 687 (4th Cir. 1976)). As a matter of law, I find that L&M has failed to demonstrate the existence of such an element. With the exceptions discussed above, the record reflects that Gaalswyk treated EES as a separate legal entity. EES was sufficiently capitalized, and Gaalswyk repeatedly attempted to secure more funding to make EES a success. EES had a functioning board of directors and maintained many of the necessary corporate formalities and records. EES did not pay dividends, as all potential dividends were invested back into the company. At most, L&M was an unsecured creditor that agreed to provide services on a pilot project that ultimately failed, leaving L&M unpaid. While this situation is unfortunate, it does not support L&M's effort to pierce the corporate veil and impose liability on Gaalswyk. Gaalswyk is entitled to judgment in his favor as a matter of law.

### B.  *Piercing the Veil to Reach Non-shareholders – Hinz, Parra and EAI*

L&M also seeks to pierce the corporate veil to hold Hinz, Parra and EAI liable. Hinz and Parra were directors of EES, while EAI was a supplier and creditor.[6] While veil-piercing is generally used to impose liability on the shareholders of a corporation, it

---

[6] In an interrogatory answer, Hinz also reported having a marginal ownership stake in EES. Doc. 22-6 at 2.

may also be employed under Minnesota law to reach non-shareholders. *See Equity Tr. Co. Custodian ex rel. Eisenmenger IRA v. Cole*, 766 N.W.2d 334, 339–40 (Minn. Ct. App. 2009) ("Because veil piercing is grounded in equity and intended to prevent abuse of corporate protections, we hold that a district court may pierce the corporate veil to impose personal liability against any party who disregards the corporate form, regardless of whether the party holds an ownership interest in the entity."); *see also Bank of Montreal v. Avalon Capital Grp., Inc.*, No. CIV. 10-591 MJD/AJB, 2012 WL 1110691, at *10 (D. Minn. Apr. 3, 2012) (recognizing that Minnesota law permits veil-piercing to reach non-shareholders). The rationale is that if ownership was required for veil-piercing liability, then "unscrupulous parties could avoid personal liability . . . by simply acting in a capacity that does not involve ownership." *Cole*, 766 N.W.2d at 339. Thus, Hinz, Parra and EAI can be held liable for EES' obligations if they abused the corporate form by using EES as a mere instrumentality or alter ego. *See id.* at 339–40.

However, L&M's arguments against these defendants are entirely without merit. L&M argues that Hinz and Parra should be held liable because they were on EES' board of directors and failed to follow corporate formalities. However, as discussed above, L&M has failed to provide evidence supporting this argument. The record demonstrates that Hinz and Parra were added as independent directors due to their expertise in the energy industry. EES substantially complied with corporate formalities, particularly when Hinz and Parra were acting as directors. While EES could have kept better records regarding its loan payments to Gaalswyk, L&M's evidence does not indicate that either Hinz or Parra used EES as their alter ego.

L&M also argues that Hinz and Parra, like Gaalswyk, should be held liable for inducing L&M to work on EES' pilot project despite knowing of EES' insolvency. As discussed above, however, this claim fails for lack of evidence. L&M has simply failed to show that EES was insolvent when L&M was retained or that Hinz and Parra acted fraudulently in retaining L&M.

19

Finally, L&M argues that EAI should be held liable for EES' obligations on the basis of fraudulent conduct. L&M argues that although EAI leased real estate to EES for a pilot facility, there is no evidence that EES actually paid rent. Doc. 22 at 11. It also notes that EAI loaned money to EES but argues that there is no evidence that EES paid interest on such loans. *Id.* Thus, according to L&M, EAI improperly and fraudulently received a benefit by the work L&M performed on EES' pilot facility. *Id.* at 11–12.

These arguments have no support in the record. By failing to properly respond to defendants' statement of facts and evidence, L&M has admitted that EES paid rent to EAI and that EAI made valid secured loans to EES. The record demonstrates that EAI and EES were separate corporate entities that were related through sharing one director and CEO, Gaalswyk. L&M has failed to produce evidence giving rise to a genuine issue of fact as to whether EAI used EES as an alter ego.

Finally, even if L&M had established that any of the "alter ego" factors support piercing the corporate veil to reach Hinz, Parra or EAI, L&M has failed to show the necessary element of injustice or fundamental unfairness that would compel the imposition of liability on any of those defendants. Hinz, Parra and EAI are entitled to judgment in their favor as a matter of law.

## VI. CONCLUSION

For the reasons set forth herein:

1. Defendants' motion (Doc. 18) for summary judgment is **granted** in its entirety.

2. Because this order disposes of all claims, the trial of this case, currently scheduled to begin March 15, 2021, is **canceled**.

3. Judgment shall enter against plaintiff and in favor of defendants and the Clerk's office shall **close this case**.

20

**IT IS SO ORDERED.**

**DATED** this 4th day of January, 2021.

_____
Leonard T. Strand, Chief Judge